IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ROSEANNE V. JOHNSON,<br><br>    Plaintiff,<br><br>  v.<br><br>SOCIAL SECURITY ADMINISTRATION,<br><br>    Defendant. | Case No. 8:05CV300<br><br>MEMORANDUM AND ORDER |

  Plaintiff Roseanne Johnson ("Johnson") seeks review of a decision by the defendant Social Security Administration ("SSA") denying Johnson's applications for disability insurance benefits filed under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.*, and supplemental security income filed under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* Johnson originally filed these applications on June 19, 2002. Social Security Transcript ("TR") at 52, 251. The applications were based on allegations that Johnson has been unable to work since May 28, 2002, due to migraine headaches; high blood pressure; blurry vision; back, neck, shoulder, elbow, knee, hip, leg, and foot pain; allergies; depression; and anxiety. TR 58. The SSA, on initial review, denied Johnson's claims on October 16, 2002. TR 35. Johnson filed a request for reconsideration, and, after the SSA initiated another review, Johnson's request for reconsideration was denied on February 13, 2003. TR 43.

  Johnson filed a request for a hearing on March 10, 2003, and that hearing was held on May 5, 2004. TR 48, 16. Administrative Law Judge ("ALJ") Robert K. Rogers made several findings. Those were, *inter alia*, the following:

  3. The claimant's degenerative disc disease of the lumbar spine, mild degenerative changes of the cervical and thoracic spine, and hypertension

are considered 'severe' based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. [T]he claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: lift 20 pounds occasionally and 10 pounds frequently, walk/stand six hours, sit six hours, be able to stand and sit at will, avoid squatting, kneeling or crawling, occasionally crouch, stoop and balance, avoid extreme heat and cold, avoid pulmonary irritants, avoid working at heights and around moving machinery and avoid low environment and heavy vibration.

. . .

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

TR 27–28.[1]

The ALJ upheld the SSA's decision, finding that Johnson was not entitled to a period of disability or disability insurance benefits, and not eligible for supplemental security income payments. TR 28. On May 25, 2005, the Appeals Council denied Johnson's request for review. TR 7. Johnson now seeks judicial review of her claim. The court has reviewed the record, the ALJ's evaluation and findings, the parties' briefs, the transcript, and the applicable law. For the reasons stated below, the court concludes that the ALJ's findings are not supported by substantial evidence.

---

[1] While not delineated as a separate finding, it is noted that the AJL did find, in the body of the opinion, the following concerning the claim of fibromyalgia: "The medical evidence indicates that *the claimant has fibromyalgia*, degenerative disc disease of the lumbar spine, mild degenerative changes of the cervical and thoracic spine, and hypertension, impairments that are 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." TR 21 (emphasis added). While it appears that failure to include fibromyalgia in the findings was inadvertent, its absence from the findings is error.

2

**Medical Background**

Johnson was born on September 25, 1958, and was 43 years old when she first filed her applications for Title II and Title XVI benefits. She completed the ninth grade (TR 64, 150),[2] and has past work experience as an over-the-road truck driver and material handler. TR 59.

In January of 2002, Johnson saw her then primary treating physician Dr. R. E. Jackson ("Dr. Jackson"), complaining of painful sacrum, coccyx, and hip areas. He ordered a radiology report, which indicated early findings of degenerative joint disease in both hip joints and both sacroiliac joints. TR 192–93.

On October 28, 2002, Johnson was referred to a consulting physician, Dr. Robert M. Valente ("Dr. Valente"), a rheumatologist. He noted significant pain behavior at many muscle attachment sites. Dr. Valente observed tenderness in Johnson's tailbone, pelvic region, and spine, and suggested she might have pelvic floor tension myalgia. Dr. Valente found Johnson had mild osteroarthirtis in her right hand, but noted that there was no active synovitis. Further, Johnson was found to have excellent rotator cuff functions, good movement in the hips, normal pulse, preserved deep tendon reflexes except slight reduction in her right ankle, and normal lower extremity strength. An examination of Johnson's knees revealed mild sclerosis, but no obvious joint space narrowing, chondrocalcinosis, or tendinous calcification. TR 156. Dr. Valente stated that Johnson did not have a crippling or life threatening arthritis condition, but made no determination as to

---

[2]In testimony given by Johnson at her hearing, she claimed to have only completed the eighth grade. TR 271. However, whether she finished eighth or ninth grade, she was found by the ALJ to be a person with limited education. TR 27.

3

disability.[3] He stressed the need for healthy habits, including sufficient sleep, weight management, stretching and exercising, and emphasized the importance of pain management (which he left for Johnson's primary treating physician) and the need for a "paced" lifestyle. TR 157.

Johnson, still suffering from her symptoms, submitted to a lumbar spine magnetic resonance imaging ("MRI") on November 13, 2002. This MRI showed early disc dehydration at L5-S1, degenerative disc space changes at L4-5 and L5-S1, and mild central canal narrowing, mild dehydration, and mild facet and ligamentous hypertrophy at L4-5; however, tests failed to show any disc herniation. TR 165–66.

Johnson was then referred to consulting physician Dr. Patrick Bowman ("Dr. Bowman"), a back specialist, who saw her at the Nebraska Spine Center on February 11, 2003. He also found mild degenerative changes with some anterior spurring, disc space narrowing, and scoliosis. He recommended that Johnson maintain a conservative care path of stress management, and remarked that she might be a candidate for back surgery in the future (noting that her present tobacco use precluded such a surgery). TR 195–96.

Due to a modification in insurance coverage, Johnson's primary care physician changed to Dr. Stacy Goodrich ("Dr. Goodrich"), who first saw Johnson on December 12, 2003. Dr. Goodrich referred Johnson to consulting physician Dr. Jay G. Kenik ("Dr. Kenik"), a rheumatologist at Creighton University, and Johnson saw Dr. Kenik on May 14, 2004. He noted that Johnson had been seen by Drs. Valente and Bowman, and that she had been diagnosed with chronic pain syndrome with features of fibromyalgia along with mechanical back pain. Further, he noted that imaging had shown mild degenerative

---

[3]Dr. Valente noted that rheumatologists are not ordinarily trained to provide disability determinations.

4

disease of the knees with some medial sclerosis, along with some spondylitic change in the back, especially towards the lower lumbar region. He assessed Johnson with classic fibromyalgia, spondylosis, back pain, and mild degenerative arthritis. TR 245–46.

Dr. Kenik filled out a residual functional capacity ("RFC") questionnaire, dated May 14, 2004, in which he opined Johnson cannot walk more than four city blocks without rest, can sit continuously for one hour, can stand continuously for one hour, and can sit and stand four hours in an eight-hour work day. Further, he suggested she could occasionally lift up to ten pounds, but should never lift twenty pounds or more. Finally, he stated that he believed Johnson's symptoms would cause frequent and unpredictable absences from work, and that while at work she would need to shift between sitting and standing at will. TR 247–50.

The ALJ relied on two other physicians' opinions, Dr. Thomas Calvert ("Dr. Calvert") and Dr. Tom Chael ("Dr. Chael"), both non-treating state agency ("SA") physicians. Dr. Calvert, in a RFC assessment dated October 15, 2002, opined that Johnson could frequently lift ten pounds and occasionally lift twenty pounds. Further, Dr. Calvert stated that Johnson could stand and/or walk six hours in an eight-hour work day, and could sit for six hours in an eight-hour work day. Dr. Calvert suggested that Johnson's statements were partially credible, but noted that her treating physician had not (by that time) suggested physical therapy or any specific treatment for her conditions, and had not given her any specific restrictions. TR 225–29.

Dr. Chael, in a report dated February 11, 2003, similarly opined that allegations of severe functional limitation were partially credible, but that Johnson was able to do light

5

work. He stressed (mentioning twice in his evaluation) that Dr. Valente had stated Johnson did not have a crippling or life threatening arthritic condition.  TR 221–23.

In addition to these examinations for her alleged physical limitations, Johnson also received one mental evaluation, performed on September 3, 2002, by psychologist Dr. James Mathisen ("Dr. Mathisen").  Dr. Mathisen described Johnson as very affable and exhibiting good social graces, and whose judgment was above average.  Dr. Mathisen remarked that Johnson "appears able to sustain attention and concentration needed for task completion."  Further, "[s]he is able to understand and remember short and simple instructions." However, Dr. Mathisen further opined that "[s]he appears unable to carry out short simple instructions under ordinary supervision," and that "her slowed pace related to a depressive process would lend to that matter."  TR 153.  He concluded by suggesting that the prognosis appeared adequate, and that "[s]he would seem to benefit from psychotherapeutic intervention to address the depressive process and emotional disregulation." TR 154.

## Standard of Review

When reviewing an ALJ decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). Under this standard, substantial evidence means something "less than a preponderance" of the evidence, *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998), but "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Ellison v. Sullivan*,

6

921 F.2d 816, 818 (8th Cir. 1990).  "Substantial evidence is that which a reasonable mind would find as adequate to support the ALJ's decision." *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996) (citing *Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996)).  In determining whether the evidence in the record as a whole is substantial, a district court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

The substantial evidence standard "allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal." *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir.1991) (citing *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)).  If the district court finds that the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision "merely because substantial evidence would have supported an opposite decision."  *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).  Rather, if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)).

## Discussion

Johnson argues that the ALJ made several errors concerning credibility and weight, and that the record does not support the ALJ's determination that Johnson is able to perform the types of work the ALJ found she could.  Based on a review of the evidence,

the court finds that substantial evidence does not exist on the record to support the ALJ's determination.

### 1. Claimant's Subjective Allegations of Pain

When assessing the credibility of a claimant's subjective allegations of pain, the ALJ must consider several factors. Those factors include observations by third parties and treating and examining physicians relating to such matters as claimant's daily activities; duration, frequency, and intensity of pain along with precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). "When an ALJ rejects a claimant's complaints of pain, he or she must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the *Polaski* factors." *Kelley,* 133 F.3d at 588 (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In this case, the ALJ found Johnson to be only partially credible, and that her pain complaints "are not found fully credible because the SA determined in 2002 that physically the claimant could perform light work, . . . and in February 2003, the physical determination was consistent with that of October 2002." TR 13. As explained below, the SA physicians' determinations were given undue weight, and Johnson's doctors' opinions were improperly discredited. However, other factors weigh in on Johnson's credibility.

First, the court looks to the claimant's daily activities. In this case, the record clearly and consistently demonstrates that she has very limited daily activities. The ALJ noted that "her daily activities include preparing meals, fixing coffee, washing dishes, getting the mail, going to the grocery store, driving two to three times a week, visiting, sometimes doing

8

laundry, and sitting in a recliner four to five hours a day," and that the "record documents that her daily activities also include watching TV, doing puzzles, caring for pets, and handling her money."  TR 21–22.  However, these findings distort the record, as they ignore the restrictions that Johnson places on such activities.  She prepares meals with her husband's help. TR 275.  She does dishes and other housework piecemeal, taking several breaks, and frequently requires the assistance of her husband.  TR 276–78.  When caring for her dogs, she feeds them and lets them outside, but stated that she no longer is able to take them on walks.  TR 83.  Further, she stated that although they weigh only 14 and 16 pounds, she is not able to "pick them up anymore."  TR 276.  Finally, although Johnson rests in a recliner four to five hours a day, she testified that she cannot stay sitting for too long and that her "morning goes between the recliner, stand up, . . . back to the recliner. . . ."  TR 276.  Johnson argues that the ALJ failed to quantify or qualify her daily tasks, and failed to consider the pace and the frequency these daily tasks are performed.  The court agrees, finding that this first factor bolsters Johnson's credibility.

Second, the court looks to the duration, frequency, and intensity of pain, and in combination with those, any aggravating factors of pain.  In this case, claimant's complaints and descriptions of her pain are well documented.  Johnson describes the frequency of her pain as "all the time continuously," and the level of her pain as having "good day tolerable to bad days severe with tears.  Hurt all the time so I don't notice the number of days.  Some days I wake up tolerable as day goes on it gets severe or somedays I wake up to severe."  TR 82.  Further, she stated that she hurt "from about middle [of the back] all the way to tailbone."  TR 273.

9

Johnson's doctors support her own statements about her pain. Dr. Jackson noted she had painful sacrum, coccyx, and hip areas, detailing "[t]enderness over the scapulae and low back, marked tenderness over the L5-S1 region, tenderness over the lt. trochanteric bursa. Pain with ROM of the hips." TR 193. Dr. Valente noted that she had "significant pain behaviors," and was "quite tender on wiggling the tailbone and also tender to the left in the pelvis soft tissue." He further noted that "[t]he spine is tender pretty much wherever there is muscle attachments and particularly about the pelvis, dimples of Venus, greater trochanters and the like." TR 156. When later asked about his observations, Dr. Valente commented "the main things that stood out were those of a chronic multifactorial chronic pain syndrome that included features of widespread pain or fibromyalgia. Indeed she meet criteria for that diagnosis." TR 242. Dr. Bowman noted that she complained of "joint inflamation and swelling for which she has been to see a rheumatologist who has noted a rheumatological component of her pain. She also reports having back pain, [and] some loss of balance in the left lower extremity due to pain." TR 195. Dr. Kenik noted that the range of motion of her back "lacked about 10° full extension because of pain with a similar loss of lateral bending and rotation because of discomfort." Dr. Kenik further noted that her "[t]ender points numbered 18 of 18." TR 246.

Finally, Johnson's husband has made comments that also lend support to Johnson's complaints of pain. He stated that she was "painful with tears (occasional tears)" and that "she can't sit, stand/walk very long. Has headaches, chronic pain thru-out [sic] body daily." TR 90. He further stated that she hurt so bad that "[s]he got to where she couldn't do hardly any of the driving. . . . She just had a lot of problems." TR 282.

Johnson argues that no physician has indicated any symptom magnification or disbelief in Johnson's claims of pain. The court agrees—the reports of her treating physicians, combined with her own continued and unwavering assertions, and the assertions of her husband, lend support to the veracity of her statements. Therefore, this second factor also weighs heavily in support of giving Johnson's statements significant credibility.

Third, the court looks to the dosage, effectiveness, and side effects of medication. In this case, the medication record is extensive. From June 1, 2002, to May 4, 2004, Johnson had been proscribed or given samples of Methylprednisolone (anti-inflammatory), Lexapro (antidepressant), Cyclobenzaprine (skeletal muscle relaxant), Etodolac (anti-inflammatory), Wellbutrin (antidepressant), Toprol (blood pressure), Norvasc (blood pressure), Rhinocort (anti-inflammatory), Allegra (antihistamine), Hydrochlorothiazide (blood pressure/anti-hypertensive), Benicar (blood pressure), Aciphex (stomach, intestinal, and throat acid), Hydroxyzine (allergy/insomnia), Celebrex (anti-inflammatory), and Vioxx (anti-inflammatory). TR 239–40. While it is true that Johnson has not reported any side effects due to her prescriptions, the sheer number of prescriptions or samples given to her by her doctors during the relevant time period weigh heavily in granting significant credibility to Johnson's complaints.

Finally, the court looks to any functional restrictions that might have been placed on the claimant. In this case, there have been several restrictions placed on Johnson by her various doctors. First, Dr. Valente stressed the need for a "paced" lifestyle. Dr. Bowman recommended that she maintain a conservative care path of stress management. Finally, Dr. Kenik placed several functional restrictions on her, including not lifting items that weigh

20 or more pounds, and not standing or sitting more than four hours in an eight-hour work day. These functional restrictions are consistent with what Johnson claims to be able to do, and also weigh in favor of giving Johnson's statements significant credibility.

## 2.  Treating, Consulting, and Non-Treating Physician Opinions

When the issue concerns the appropriate weight to give a treating physician's opinion, error exists when an ALJ fails to consider or discuss a treating physician's opinion that a claimant is disabled when the record contains no contradictory medical opinion. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). "The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)). However, a treating physician's opinion is not automatically controlling—it must be assessed against the record as a whole and may be discounted if it is inconsistent with other parts of the same opinion or inconsistent with the record as a whole. *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005).

In this case, the ALJ made RFC findings substantially consistent with the first SA physician, Dr. Calvert, who submitted an assessment dated October 15, 2002. As such, it cannot be said that the record contains *no* medical support as to this RFC finding. However, when viewed in its entirety, the record provides little support for Dr. Calvert's determination. Dr. Calvert considered Johnson's records and rendered his opinion well before she was examined by Drs. Valente, Bowman, Goodrich, and Kenik. Since Dr. Calvert's assessment was made when the medical history was underdeveloped, his

12

determination as to Johnson's RFC was made on an incomplete record and should have been given little weight.

The ALJ also places a great deal of weight in the opinion of the second SA physician, Dr. Chael, whose report dated February 11, 2003, stated that Johnson is still capable of light types of work, basing this conclusion on the statement by Dr. Valente that Johnson does not suffer from a "crippling" arthritic condition. This assessment, similar to Dr. Calvert's, is deficient in that it occurred before Drs. Bowman or Kenik treated Johnson.[4] Moreover, Dr. Valente's statement that Johnson does not suffer from *crippling* pain does not lend complete support to the notion that she does not suffer from *disabling* pain. As Dr. Valente noted, he was not in a position to determine disability—his statement seems made for no other purpose than to reassure Johnson that her condition was not crippling or life threatening.[5] The treating physicians, particularly the specialists Drs. Valente and Kenik, should have been given controlling weight, and failure to do so was error.

## 3. The Accuracy of the Hypothetical Submitted to the Vocational Expert

To assist an ALJ making a disability determination, a vocational expert ("VE") is many times asked a hypothetical question to help the ALJ determine whether a sufficient number of jobs exist in the national economy that can be performed by a person with a similar RFC to the claimant. A hypothetical question is properly formulated if it incorporates impairments "supported by substantial evidence in the record and accepted as true by the ALJ." *Guilliams*, 393 F.3d at 804 (citing *Davis v. Apfel*, 239 F.3d 962, 966

---

[4] This is particularly true since Dr. Kenik, a rheumatologist, made specific RFC findings inconsistent with the SA physicians.

[5] In other words, it seems that the ALJ discredited Dr. Valente's pain assessments by claiming that as a rheumatologist he was in no position to determine disability, while at the same time accepting his statement that she was not suffering from a crippling or life threatening disease as an authority suggesting she was not disabled.

13

(8th Cir. 2001)).  "[A] vocational expert's responses to hypothetical questions posed by an ALJ constitutes substantial evidence only where such questions precisely set forth all of the claimant's physical and mental impairments."  *Wagoner v. Bowen*, 646 F.Supp. 1258, 1264 (W.D. Mo. 1986) (citing *McMillian v. Schweiker*, 697 F.2d 215, 221 (8th Cir.1983)). Courts apply a harmless error analysis during judicial review of administrative decisions that are in part based on hypothetical questions.  For judicial review of the denial of Social Security benefits, an error is harmless when the outcome of the case would be unchanged even if the error had not occurred.  *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003).

In his hypothetical question to the VE, the ALJ in this case queried about a hypothetical individual who would be able to "perform a full range of light work," and did not include "a requirement for additional breaks throughout the workday ten to fifteen minutes two or three times a day," or the need for a sit/stand/walk option.  TR 284.  Johnson argues the ALJ's hypothetical question to the VE was incorrect and contrary to limitations set forth by Johnson and inconsistent with medical observations made by her doctors.

As stated before, the court believes that the ALJ made improper credibility determinations and incorrectly weighed the various doctors' opinions.  Therefore, the court finds that the hypothetical question based on those errors was also improper—the ALJ's assessment of Johnson's ability to perform a full range of light work, and his failure to include the requirement for additional breaks throughout the day, was incorrect.  Further, the error was not harmless.  The VE was asked by Johnson's attorney whether the requirement of additional breaks throughout the day would affect her ability to maintain employment.  The VE's response was that the "requirement for additional breaks would not

14

necessarily impact ability to perform work, but would impact her ability to maintain work and perform work as it's generally done within a schedule for employers. Therefore, it is my opinion that it would eliminate the ability to maintain permanent work." TR 286. Further, the VE stated that considering a hypothetical "which allows or requires ability to sit, stand, and walk about 50 to 100 feet throughout the day or during the day, it would be my opinion that there would be no work available in the national economy." TR 286. Since the question asked by the ALJ did not set forth all of Johnson's impairments, and the availability of work in the national economy indicated by the VE changed when those impairments were included in the hypothetical question, the ALJ could not properly rely on the answer to his hypothetical question.

When reviewing an ALJ's opinion not to extend Social Security benefits, a court will affirm the ALJ's opinion if it is supported by substantial evidence on the record. Substantial evidence supporting the ALJ's decision is lacking given Johnson's subjective assessment of her pain, the opinions of her treating and consulting physicians, and the RFC filled out by consulting physician Dr. Kenik. Accordingly, the court concludes the ALJ's decision that Johnson does not meet the disability requirements set forth under the Act is unsupported by substantial evidence in the record as a whole.

THEREFORE, IT IS ORDERED that the findings and conclusions of the ALJ are reversed and benefits are awarded. A separate judgment shall be entered in conjunction with this memorandum and order.

DATED this 1st day of September, 2006.

BY THE Court :

s/Joseph F. Bataillon
Chief United States District Judge